IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| SEAN M. CARROLL,  Plaintiff | ) ) ) | |
| v. | ) ) ) | No. 1:20-cv-00126-MSM-LDA |
| WALTER R. CRADDOCK, ADMINISTRATOR OF THE RI DIVISION OF MOTOR VEHICLES,  Defendant | ) ) ) ) ) ) | |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge

The American love affair with the automobile is well-known.[1] With some densely urban exceptions, we are a nation of drivers, not bus takers.[2] We drive when

---

[1] Jeremy Hsu, *Why America's Love Affair with Cars is no Accident,* Scientific American (May 24, 2012) ( https://www.scientificamerican.com/article/why-americas-love-affair-cars-no-accident/).

[2] According to ongoing studies by the United States Department of Transportation, "87% of daily trips take place in personal vehicles and 91% of people commuting to work use personal vehicles."  U.S. Dept. of Transportation, *National Household Travel Survey Daily Travel Quick Facts,* Bureau of Transportation Statistics https://www.bts.gov/statistical-products/surveys/national-household-travel-survey-daily-travel-quick-facts (Aug. 19, 2020).

we could walk. For some, the automobile is a symbol of prestige,[3] for others a utilitarian way to get around.[4] For some, it is an instrument of grand adventure,[5] for others a tried-and-true way of putting a baby to sleep.[6] Sometimes it is a repository for personal goods;[7] for unfortunate others, sometimes it is a home.[8] For Sean Carroll it is, no doubt among other things, a vehicle for personal expression: this Rhode Island resident has a strong commitment to the environment and it is because of that

---

[3] "A rise in tangible luxury offerings in vehicles, shifting consumer preferences from sedan to SUVs, and increasing disposable incomes of consumers have been propelling the demand for luxury cars around the world." https://mordorintelligence.com/industry-reports/luxury-car-market (Aug. 19, 2020).

[4] Whether an owned vehicle, a rental one, or a Zip-car, the automobile is the preferred method for getting around. DeBord, Matthew, "The car is about to transform society – for the second time." (March 28, 2016). https://www.businessinsider.com/how-important-cars-have-been-for-society-2016-3.

[5] Hunter S. Thompson described the feeling behind his trip in the Red Shark in this way: "Every now and then when your life gets complicated and the weasels start closing in, the only cure is to load up on heinous chemicals and then drive like a bastard from Hollywood to Las Vegas ... with the music at top volume and at least a pint of ether." *Fear and Loathing in Los Vegas: A Savage Journey to the Heart of the American Dream* (1971).

[6] "New parents drive an average of 1,322 miles per year to put their kids to sleep, according to a 2012 UK study. Dads averaged up to 1,827 miles in the study, and half of all the parents surveyed admitted to driving their kids around to get them to sleep at least once a week." Ben Radding, *Why Driving In A Car Puts Your Baby to Sleep,* Fatherly (Aug. 26, 2019). https://www.fatherly.com/ health-science/why-driving-car-baby-sleep-womb/

[7] *See*, *People v. Taylor,* 614 N.E.2d 1272, 1277 (Ill.App. 1993) (for defendant, who was a passenger in her boyfriend's car during a cross-country trip, "[t]he interior of the Volvo was in a sense their 'home' for the duration of the trip.").

[8] In one American city as recently as a year ago, 1,794 people were living out of their vehicles – an increase of 45% from two years before. Vivian Ho, *The Californians forced to live in cars and RVs,* The Guardian (Aug. 18 12:29 PM) https://www.theguardian.com/us-news/2019/aug/05/california-housing-homeless-rv-cars-bay-area,

attitude that he has become embroiled in this controversy with the Rhode Island Division of Motor Vehicles ("DMV"), the state arbiter of license plate alphanumeric assignments. Mr. Carroll, as a manifestation of his views, bought himself an electrically powered TESLA automobile and, in August of 2019, requested from the DMV[9] the license plate "FKGAS."[10] It was issued in the ordinary course of such requests, but several months later, after the DMV received a complaint, it recalled the plate on threat of a revocation of his vehicle registration were Mr. Carroll not to return it. Mr. Carroll chose to put his energy where his mouth is, and commenced this litigation, seeking to enjoin the DMV from recalling the plate and from revoking his registration.

Like many states, Rhode Island uses the vehicle license plate program not only to identify vehicles but as a revenue source. To that end, it offers four types of license plates. First, there are the standard, randomly generated ones, on the "official" state plate that denotes Rhode Island as the Ocean State. It boasts on the white background a light blue "wave" and a navy-blue anchor in the top left corner. http://www.dmv.ri.gov/plates/overview/. It is available to registrants of motor

---

[9] Mr. Craddock has been sued in his official capacity as Administrator of the Division of Motor Vehicles. The defendant is referred to at various places in this memorandum as "Mr. Craddock," "the DMV" and "the Registry."

[10] Mr. Carroll alleges, and at this early stage of litigation the Registry does not dispute, that FKGAS was his daughter's suggestion, intending a meaning of "fake gas" to refer to the electric car. He does not contest, however, that the plate could also be perceived as sending the message, "fuck gas" and he embraces that second meaning.

3

vehicles for a biennial fee of $ 32.50.[11]  Second, from time to time the Rhode Island General Assembly authorizes the production of "specialty plates" that have a different, some might say "fancier" design, and most are available to the general public for an additional surcharge of $10.00.  http://www.dmv.ri.gov/plates/special/.  As with standard plates, the alphanumeric sequence that distinguishes one plate from every other is randomly assigned, but the design of the plates generally promotes some cause or another.  *E.g.,* designating or honoring a veteran, a National Guard member, a firefighter, or a particular charity.[12]  *Id.*  Third, Rhode Island offers what are called "preferred plates" that may only be assigned through the Office of the Governor.  These plates which have a very limited number of characters (as few as two) are considered by some to be prestigious plates, and Rhode Island, in urban lore with at least some grounding in actuality, has been infatuated with these plates for decades.  *See* Tom Mooney, *"Everyone in R.I. wishes their car had a low-number plate. Be careful what you wish for,"* Providence Journal (October 17, 2019) ("this is Rhode Island, where vanity-plate adoration is stamped into the resident DNA").

The Fourth type of plate is the one with which we are concerned, and that is the "vanity plate."  A "vanity" plate reflects characters – up to six numbers and letters

---

[11] There is now a second standard plate, at no extra cost, that features a sailboat. http://www.dmv.ri.gov/forms/fee/index.php#4.

[12] As of this writing, for example, one can purchase a specialty plate issued with respect to Autism, the Boston Bruins, the Boy Scouts, the Bristol Fourth of July, Conservation through Education and the Dorian J. Strong Foundation, to name a few at the beginning of the alphabetical listing.  http://www.dmv.ri.gov/plates/special/  The defendant's Motion to Dismiss notes that Rhode Island had 19 specialty plates available at the time of that filing.  (ECF No. 12-1, p. 13).

– chosen by the vehicle owner.[13] http://www.dmv.ri.gov/plates/vanity/. Fees, depending on the plate, can be as high as $82.50. http://www.dmv.ri.gov/forms/fee/index.php?category= Plates&button=Search.[14]

A vanity plate request will not be granted if the same plate is already issued to someone else, as they must be unique to serve the vehicle identification purpose. Subject to that, however, the only other restriction is that "[the] DMV may refuse to issue any combination of letters and numbers which might carry connotations offensive to good taste and decency." http://www.dmv.ri.gov/plates/vanity/. The authority to implement a restriction such as this emanates directly from R.I.G.L. § 31-3-17.1, which provides in precisely the same language that "the administrator of the division of motor vehicles shall, in his or her discretion, refuse to issue any letter or combination of letters and numbers that might carry connotations offensive to good taste and decency." Although R.I.G.L. § 31-3-17.1 authorized the DMV to promulgate rules and regulations giving further guidance on what is not allowed, there is no indication at this stage of the litigation that the DMV has exercised that opportunity.

---

[13] In Rhode Island, this type of license plate is also referred to as a "courtesy plate," but in order to be consistent with most of the case law across the country, and with the most familiar term used by Rhode Islanders, this Memorandum will refer to the plate at issue as a "vanity plate," with no intent to impugn or otherwise render a judgment on the motivation of those who are willing to spend extra money to obtain one.

[14] The reader with more than a passing interest will discover, by reading the cases cited *infra*, that most states seem to offer both specialized plates, as were at issue in *Walker v. Texas Division, Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 208, 135 S.Ct. 2239, 2246, 192 L.Ed.2d 274 (2015) and vanity plates, as are at issue here. Much more about *Walker* below.

Instead, its history of granting and rejecting vanity plate requests leaves the observant to try to glean some governing principles. According to Mr. Carroll, the DMV has prohibited such combinations as AIDS, CHRIST, GAY, JESUS, LESBIAN, REDNECK and YANKEE. But it has issued plates that read CHRIST, JEWISH, REDNEC, and REDNEK. It has prohibited words that are typically denigrating, such as CHUBBY and SLOB, but allowed FATT and OLDFRT. It has both prohibited and allowed YELLOW, prohibited and allowed JESUS, and prohibited and allowed APPLE.[15]

It may be, as Mr. Carroll claims and the DMV seems to acknowledge, that the most influential criterion is whether someone complains. The DMV reviews thousands of requests for vanity plates per year[16] and its memorandum in support of the pending motion to dismiss suggests that it may not have the resources to carefully

---

[15] There does not seem to be, at least at this stage, any real dispute about the facts here, although later stages of litigation may counter that impression. The issues addressed with respect to the preliminary injunction do not turn on any facts other than those surrounding Mr. Carroll's particular experience with the DMV and his "FKGAS" plate – facts which are not disputed. This memorandum does not address the plaintiff's claim that the DMV has approved and rejected requests arbitrarily, which would involve a determination of whether the allegedly inconsistent decisions were in fact made. With respect to the motion to dismiss, the Court is to accept as true the facts as alleged by the plaintiff and all reasonable inferences derived therefrom. *See* Complaint (ECF No. 1), Para. 14 – 19.

[16] Mr. Carroll alleges, and the DMV seems to agree, that between 2012 and 2018, the DMV issued more than 41,000 vanity plates. (ECF No. 4-2, p. 7; Defendant's Motion to Dismiss, ECF No. 12-1 at p. 28-29. It has been reported that "[f]ifty times since 2012, according to state data, the Division of Motor Vehicles has had to reject license plate applications that veered off the road of decency" https://www.providence journal.com/news/ 20181116/risque-ri-vanity-license-plate-requests-turned-away-by-dozens *See* ECF No. 12-1 at p. 17 (45 rejections).

scrutinize all requests. In this case, it seems to have been a complaint, as recited by the DMV in its letter requesting return of the plate, that kicked off the close review. (ECF No. 1, para 28).

In a three-count Complaint, Mr. Carroll maintains that there is no rhyme or reason to the DMV's decision-making and that therefore it is arbitrary and capricious in violation of due process. Moreover, he contends that the statutory restriction is vague and overbroad. And, first and foremost, he maintains that the government has taken a nonpublic forum and imposed content restrictions on it that run afoul of First Amendment constitutional protection.

Before the Court are two Motions: the plaintiff's Motion for Preliminary Injunction[17] and the defendant's Motion to Dismiss. (ECF Nos. 4, 12). For the reasons discussed below, the Court grants the Motion for Preliminary Injunction and denies the Motion to Dismiss. By definition, the conclusion reached below that the plaintiff has shown a likelihood of prevailing on the merits, required to support the injunction, supports the finding that the plaintiff has also demonstrated a plausible claim under Fed. R. Civ. P. 12(b)(6).

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction is clear pursuant to 28 U.S.C § 1331 by virtue of the federal questions presented, and the matter is brought under 42 U.S.C. § 1983. This Court

---

[17] Mr. Carroll filed a Motion for Temporary Restraining Order and Preliminary Injunction. (ECF No. 4). The Registry agreed to voluntarily refrain from any action revoking Mr. Carroll's registration until after the Court ruled on that Motion. (ECF No. 9). In light of the Court's granting of a Preliminary Injunction, the request for a TRO has become moot.

has the authority to grant the injunctive relief requested. No damages are requested, and Mr. Craddock is sued in his official capacity only. In light of the challenge to the facial constitutionality of the statute, as well as the manner in which it is applied, the Court's review is independent, with no deference owed to the administrative agency.[18]

## THE MERITS

### First Amendment As Applied

The starting place for any discussion such as this is to determine what kind of forum the Rhode Island vanity plate terrain presents. That will lead us to the criteria that will govern the decision-making in our quest to determine whether Mr. Carroll deserves a preliminary injunction and whether he has made out a plausible claim that Rhode Island has violated the First Amendment in its rejection of FKGAS. The

> forum analysis [is] a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes. Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum.

*Cornelius v. NAACP Legal Defense and Education Fund, Inc.,* 473 U.S. 788, 800, 105 S. Ct. 3439, 87 L.Ed.2d 567 (1985).

First, there is a forum for "government speech," and, unlike the case with "private speech," the government may choose in its discretion how it expresses itself. *Walker v. Texas Division, Sons of Confederate Veterans, Inc.,* 576 U.S. 200, 208, 135

---

[18] At this stage, it appears there was no administrative fact-finding to which deference might be owed.

S. Ct. 2239, 2246, 192 L.Ed.2d 274 (2015) (under the Texas scheme, specialty license plates are government speech); *Pleasant Grove City, Utah,* v. *Summum,* 555 U.S. 460, 460, 129 S. Ct. 1125, 172 L.Ed.2d 853 (2009) (display of monuments in public park is government speech). Government speech is exempt from First Amendment scrutiny. *Matal v. Tam,* ___ U.S. ___, 137 S. Ct. 1744, 1758, 1987 L.Ed.2d 366 (2017).

Second, there are public forums which by tradition or designation are platforms, either physical spaces or mechanisms for communications, specifically dedicated to the exchange of views. *Perry Education Assn. v. Perry Local Educators Assn.,* 460 U.S. 37, 46, 103 S. Ct. 948, 74 L.Ed.2d 794 (1983).[19] In a public forum, "speakers can be excluded [] only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius,* 473 U.S. at 800.

Third, there are nonpublic forums where "[a]ccess … can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (partially quoting *Perry,* 460 U.S. at 46). Reasonableness is weighed with regard to the purpose of the limitation. *National Ass'n of Social Workers v. Harwood,* 860 F. Supp. 943, 952 (1994).

---

[19] There is also such an animal as a "limited public forum," in which a location or medium is open for expression to a particular category or subset of users. *Perry,* 460 U.S. at 48. The similar but distinct "designated public forum" is one opened to public discourse by intentional government conduct. *Del Gallo v. Parent,* 557 F.3d 58, 72 (1st Cir. 2009). They are distinct classifications. *Walker,* 135 S. Ct. at 2250.

9

Government Speech

The DMV puts forth the view that the vanity plate is a vehicle only for government speech. Were that true, this case would be over, as there is no question that when it speaks for itself government may choose its own message. Therefore, this contention must be addressed first.

Tempting as a quick answer might be, I reject the view that the situation before me involves government speech. First, the fact that the government owns the medium – the plate – does not control the result. From *Tam,* 137 S. Ct. at 1759, we learned that trademarks are not government speech, even though the government exclusively controls the process for issuing trademarks. The analysis must scrutinize a variety of aspects beyond simply the ownership of the metal and the fact that it is the government that issues the plates. The answer lies in *Walker*, *supra*, which held that the specialty plates distributed by the State of Texas were a forum for government speech. *Walker* stressed that the government had exclusive choice over the design of the plate, even though a private organization might propose it and that license plates which carry a specific logo or design have traditionally been used to promote a state's interest or espouse an official state message. *Walker*, 135 S. Ct. at 2248 (citing "Keep Florida Green," "Hoosier Hospitality," "Green Mountains," and "America's Dairyland" among other examples.) "States have used license plate slogans to urge action, to promote tourism, and to tout local industries." *Id.* The prominent name of the State is displayed on each plate, thus turning the plate into a kind of "government ID" for the locality. *Id.* at 2249. Furthermore, the general

10

viewing public understands that, in contrast to "Live Free or Die,"[20] the combination of letters and numbers in a vanity plate's message makes it apparent that "the driver is the one speaking," not the government. *Kotler v. Webb,* Case No. CV 19-2692-GW-SKx, 2019 WL 4635168, at *7 (C.D. Cal. Aug. 29, 2019).

*Walker* itself insisted that its holding on government speech did not extend beyond those specialty plates and it took pains not to express an opinion on vanity plates, referred to as the "personalization program" in Texas. "Texas law provides for personalized plates (also known as vanity plates) [but h]ere we are concerned only with the second category of plates, namely specialty license plates, not with the personalization program." *Walker*, 135 S. Ct. at 2244. And just two years later, holding that trademarks are not government speech, the Court warned that *Walker* "likely marks the outer bounds of the government speech doctrine." *Tam,* 137 S. Ct. at 1760.

The portion of the plate at issue here – the unique alphanumeric sequence embossed on the metal – bears no indicia of government speech. Unlike the plate's design, which may include an official state motto or slogan, the vanity portion is chosen entirely by the automobile owner requesting it. It has significance to him or her and often to no one else. Indeed, it is entirely possible that the import of particular numbers and letters are entirely meaningless to the other drivers on the road. Which of us would imagine that "RELUSG" denotes a car owned by Richard E.

---

[20] "Live Free or Die" is, or at least was in 1977, the motto embossed on New Hampshire's official plates. *Wooley v. Maynard,* 430 U.S. 705, 97 S.Ct. 1428 (1977).

Lannihan and his wife Ursula S. Green?  Or might some imagine it is owned by a Civil War buff celebrating both Robert E. Lee and Ulysses S. Grant?  Or maybe, in an entirely commercial vein, it stands for "Remember Ellen's Low-Cost Uniform Scrub Garments."[21]

The very essence of vanity plates is personal expression. *See Lewis v. Wilson,* 253 F.3d 1077, 1079 (8th Cir. 2001) (likening vanity plates to bumper stickers, intended to give vent to the driver's personality, to reflect the views of the holder of the plate). They are not government speech and *Walker* has no applicability here.[22]

Nonpublic Forum

There is beginning to exist a small cluster of post-*Walker* cases addressing vanity plates.  In the oft-cited *Hart v. Thomas,* 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019), the Court termed vanity plates a nonpublic forum – a government platform not totally open to all speech, in contrast to a public forum.  Similarly, the Court of Appeals of Maryland held that "[v]anity plates are, therefore, a nonpublic forum, which 'exists '[w]here the government is acting as a proprietor, managing its internal operations.'" *Mitchell v. Md. Motor Vehicle Admin'y,* 148 A.3d 319, 336 (Md. 2016). They join a number of *pre-Walker* cases reaching the same forum conclusion. *See*

---

[21] The Second Circuit noted while the vanity plate in that case JN36TN was intended to stand for the Biblical reference John 3:16, it could have been the plate of a person announcing "Hi, I'm John, I'm 36 and I was born in Tennessee." *Byrne v. Rutledge*, 623 F.3d 46, 52 (2nd Cir. 2010).

[22] What Mr. Justice Alito said about trademarks is equally apt here, given the panoply of license plates the Registry has approved:  "If the federal registration of a trademark makes the mark government speech, the Federal Government is babbling prodigiously and incoherently.  It is saying many unseemly things ….. it is expressing contradictory views." *Tam,* 137 S.Ct. at 1758.

*e.g., Byrne v. Rutledge,* 623 F.3d 46, 54 (2nd Cir. 2010); *Perry v. McDonald,* 280 F.3d 159, 169 (2nd Cir. 2001); *Matwyuk v. Johnson,* 22 F. Supp. 3d 812 (W.D. Mich. 2014). *See also, Ogilvie v. Gordon,* No. 4:20-cv-01707-JST at 10 (N.D.Cal. 7/8/20) /(ECF No. 33) (avoiding determination of forum by denying motion to dismiss on grounds of plausible facial unconstitutionality). I reject as wholly unpersuasive the reasoning of *Comm'r of Indiana Bur. of Motor Vehicles v. Vawter,* 45 N.E.3d 1200, 1210 (Ind. 2015), an apparent outlier holding vanity plates government speech in ostensible reliance on *Walker*.[23]

### PRELIMINARY INJUNCTION AND MOTION TO DISMISS

In order to decide whether a preliminary injunction should issue, the Court must weigh four criteria: Mr. Carroll's likelihood of success on the merits; the likelihood that he will suffer irreparable injury if the DMV's proposed conduct is not forestalled; whether the DMV would suffer a greater burden than Mr. Carroll if it is not permitted to follow through with its revocation of the plate; and any impact on the public interest. *Sindicato Puertoriqueno de Trabajadores v. Fortuno*, 690 F.3d 1 (1st Cir. 2012). "The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 48 F.3d 618, 620 (1st Cir. 1995).

---

[23] The defendant maintains first that vanity plates are government speech. Failing that, however, he asserts in line with *Mitchell* and *Perry,* both *supra,* that they constitute a nonpublic forum.

Likelihood of success is the most important of the four factors. *Sindicato Puertoriquene de Trabajadores,* 690 F.3d at 10. With respect to the other criteria, they are easily met here. A deprivation of a First Amendment right, even if brief, is itself an irreparable injury. "As the Supreme Court has explained, '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Elrod v. Burns,* 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L.Ed.2d 547 (1976). Thus, the revocation of the license plate, which would prohibit Mr. Carroll from expressing his views on fossil fuel propulsion of motor vehicles, would stifle him in an irreparable way. Second, it is hard to see how the DMV would be harmed in any way by its inability to preclude FKGAS from being displayed for a while longer. Mr. Carroll was issued the plate in August 2019 and, by virtue of the lack of action prior to an apparent complaint as well as the stipulated postponement of enforcement, the plate has been on the road as lawful registration for just about a year since. However many months of continued display occur before a final judgment is entered in this case is unlikely to present any harm to the defendant. Similarly, the Court cannot reasonably find that the public interest would be harmed, or in any way even impacted significantly, by allowing Mr. Carroll to keep and use the plate until the litigation has ended. The fact that it took many months for someone to allege s/he was offended by the plate, and that only one person apparently was sufficiently put off by it to voice a complaint, precludes a finding that continued exposure for a while longer would operate to the detriment of the Rhode Island citizenry.

Regarding likelihood of success, for the reasons that follow I find that Mr. Carroll has carried his burden with respect to at least two theories, each of which would support a preliminary injunction.

Constitutionality of Statute as Applied

Private speech in a nonpublic forum may still be regulated by the government. However, it may not be prohibited in a way that is *either* unreasonable or content based. Any regulation or implementation of a regulation must be viewpoint neutral. *Cornelius,* 473 U.S. at 800.

I do not reach the question of the reasonableness of the regulation at issue here because I have no hesitation in finding that Mr. Carroll has demonstrated a likelihood of succeeding in the claim that the DMV has applied this statute in a way that is not viewpoint neutral. We need not look very far or wide to find a likelihood of success for this proposition. In the twin trademark cases of *Matal v. Tam,* \_\_\_ U.S. \_\_\_, 137 S. Ct. 1744, 198 L.Ed.2d 366 (2017) and *Iancu v. Brunetti,* \_\_\_ U.S. \_\_\_, 139 S. Ct. 2294, 204 L.Ed.2d 714 (2019), the United States Supreme Court established that the government's attempt to prohibit words on the basis of their scurrilous nature amounts to viewpoint discrimination. In *Tam,* a rock band composed of Asian-Americans applied for a federal trademark of "The Slants." Although the word has certainly an insulting slang meaning, the very point of the trademark was the group's desire to "reclaim" the term and "drain its denigrating force." *Id.* at 1751. The U.S. Patent Office denied the application, terming the word disparaging. Even though the "disparagement" clause was applied equally to terms disparaging all groups, the

Court nonetheless held it viewpoint discriminatory: "Giving offense is a viewpoint." *Id.* at 1763.

*Iancu v. Brunetti, supra*, is even more instructive on this issue. There, the trademark FUCT was rejected as "highly offensive" because of its ostensible profanity and vulgarity. Criteria such as "immoral," "shocking" and "scandalous" constitute viewpoints, and banning trademarks because they fit one or more of these categories is viewpoint bias. *Brunetti*, 139 S. Ct. at 2300. When the Patent Office permits JESUS DIED FOR YOU but prohibits BONG HITS 4 JESUS on grounds of "offensiveness," it offended the First Amendment. It is a "facile" assumption that particular words can be prohibited "without also running a substantial risk of suppressing ideas in the process." *Cohen v. California,* 403 U.S. 15, 26, 91 S. Ct. 1780, 29 L.Ed.2d 284 (1971) (wearing of a jacket bearing the words "Fuck the Draft" in a public courthouse could not be punished as a disturbance of the peace). And "a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Brunetti,* 139 S. Ct. at 2301.

Prohibiting FKGAS because it carries a connotation that might be offensive is sufficiently likely to run afoul of *Brunetti* as to easily satisfy the "likelihood of success on the merits" prong.

Facial Unconstitutionality of R.I.G.L. § 31-3-17.1

Although the DMV was given explicit authority by the General Assembly to promulgate guidelines for its process of granting or rejecting vanity plate requests, there is no indication that it ever did so. Thus, "carry[ing] connotations offensive to

16

good taste and decency" stands alone. It is a phrase not uncommon in the vanity plate world. *E.g., Matwyuk v. Johnson*, supra; *Morgan v. Martinez,* Civ. No. 3:14-02468, 2015 WL 2233214 at *1 (D.N.J. May 12, 2015).

A statute is overbroad and therefore unconstitutional when it so lacks standards for application that it "delegate[s] unbridled discretion to the government officials entrusted to enforce the regulation." *Lewis v. Wilson,* 253 F.3d 1077, 1079 (8th Cir. 2001) (reversing Missouri's ban on a vanity plate ARYAN-1). In the First Amendment arena, absence of specific guidelines creates "an impermissible risk of suppression of ideas." *Forsyth Cnty., Ga. v. Nationalist Movement,* 505 U.S. 123, 129, 112 S. Ct. 2395, 120 L.Ed.2d 101 (1992). Facial unconstitutionality, unlike as-applied unconstitutionality, does not depend on whether the administrator has exercised discretion in a content-based manner but whether the statute or regulation is so broad that it would permit that. *Matwyuk,* 22 F. Supp. 3d at 825. The exact same language has been either held overbroad or likely to be held overbroad by at least two federal courts. *Id.*at 824-25; *Morgan,* 2015 WL 2233214 at *8 (denying motion to dismiss on overbreadth grounds).

In addition to overbreadth challenges, the "offensive to good taste" language has been vulnerable to vagueness claims. A statute is void for vagueness either when ordinarily intelligent people cannot discern its meaning or when its meaning is so unclear that it encourages arbitrary government action. *Morgan*, 2015 WL 2233214 at *9 (denying motion to dismiss). The vagueness doctrine, in addition to ensuring notice, gives effect to the admonition that "precision and guidance are necessary so

17

that those enforcing the law do not act in an arbitrary or discriminatory way." *F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239, 253, 132 S. Ct. 2307, 183 L.Ed.2d 234 (2012) (invalidating FCC's action imposing fines for "fleeting expletives and momentary nudity").[24] A statute employing the phrase "offensive to good taste" was struck down on this basis. *Montenegro v. New Hampshire Div. of Motor Vehicles,* 93 A.3d 290, 296-98 (N.H. 2014) (striking down New Hampshire's statute using "offensive to good taste" as unconstitutionally vague). *Accord, Morgan,* 2015 WL 2233214 at *9 (claim that "offensive to good taste and decency" is unconstitutionally vague survives motion to dismiss). While the inconsistency that the plaintiff alleges has been characteristic of the DMV's past rejections and approvals of vanity plate requests is not dispositive, it is, if true, precisely the kind of arbitrary government action that vague statutes and regulations permit and, indeed, encourage.

---

[24] Although Mr. Craddock relies heavily on *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), to argue that the statute clearly refers to "vulgarity" and is not therefore vague, I find *Pacifica Foundation* inapposite, largely because of its context. George Carlin's "Filthy Words" consisted of words spoken in a vacuum, for the specific purpose of offending. While the monologue itself may have been a political expression against censorship, the words themselves carried no political meaning as they were entirely devoid of context. The words apparently consisted of references to "sexual or excretory activities and organs." *Id.* at 732. Here, the word "Fuck" is used as a verb devoid denoting opposition, not sexual intercourse. Despite its characterization as vulgar by many, "various forms of the word, primarily in its nonliteral, slang senses, have increasingly crept into casual use, not only as spontaneous expletives of shock, horror, or anger, but also as verbal tics and common intensifiers, mere indices of annoyance or impatience or even pleasant surprise: *Where are my fucking keys? What the fuck is taking so long? This is fucking awesome!*" https://www.dictionary.com/browse/fuck. How useful the 1978 *Pacifica* case is, therefore, as a standard-bearer for vulgarity, is questionable.

CONCLUSION

For the reasons expressed above, the Court finds that Mr. Carroll has satisfied the criteria for issuance of a preliminary injunction on his claims that the R.I.G.L. § 31-3-17.1 is unconstitutional both as applied in this case and on its face as overbroad and void for vagueness. Having met the "likelihood of success" standard, he has, *a fortiori,* met the less exacting standard of Fed. R. Civ. P. 12(b)(6) to withstand a motion to dismiss for failure to state a claim. Therefore, the plaintiff's motion for preliminary injunction (ECF No. 4) is GRANTED and the defendant's motion to dismiss (ECF No. 12) is DENIED.

IT IS SO ORDERED:

_____
Mary S. McElroy
United States District Judge

Date: October 2, 2020